**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DIANE GARRITY, in her capacity as
Court-Appointed Guardian Ad Litem for
JANE DOE, a minor,

     Plaintiff,

    v.                        Case No.: _____

BOARD OF EDUCATION OF THE PECOS
INDEPENDENT SCHOOL DISTRICT,
JOSHUA GREGORY RICO, in his individual capacity,
FRED TRUJILLO, in his individual capacity, and
MICHAEL LISTER, in his individual capacity,

     Defendants.

## PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF 42 U.S.C. §1983, TITLE IX AND NEW MEXICO TORT CLAIMS ACT BASED ON SEXUAL ABUSE OF A STUDENT

**COMES NOW** Plaintiff, Diane Garrity, in her capacity as Court-Appointed Guardian Ad Litem for JANE DOE, a minor, by and through her attorneys, The Hemphill Firm, P.C., and for her Complaint for Violations of 42 U.S.C. §1983, Title IX and New Mexico Torts Claims Act Based on Sexual Abuse of a Student, states as follows:

Parties, Jurisdiction and Venue

1.   At all times material hereto, Plaintiff Diane Garrity, Esq. ("Ms. Garrity") is and was a resident of Santa Fe County, New Mexico. On January 12, 2021, Judge Maria Sanchez-Gagne entered an Order appointing Ms. Garrity as Guardian Ad Litem for Jane Doe ("Jane Doe"), a minor child, in a proceeding filed in the First Judicial District Court, Santa Fe County, New Mexico as Cause No. D-1010-CV-2021-00045, for the express purpose of permitted Ms. Garrity to file the

civil claims on behalf of Jane Doe set forth herein.  Jane Doe, the minor child, is a resident of Pecos, San Miguel County, New Mexico.  Given Jane Doe's minor status, it is assumed that she may proceed using a pseudonym.  If the Court or Defendants object to that designation, Plaintiff will file an appropriate Motion at that time.

2.  Defendant Board of Education of the Pecos Independent School District ("Board of Education"), is the governing body of Pecos Independent School District ("PISD"), a political subdivision of the State of New Mexico, with its principal place of business located in Pecos, San Miguel County, New Mexico.  NMSA 1978, §22-5-4 authorizes suit against the Board of Education in connection with claims asserted against the PISD.

3.  At all times material hereto, Defendant Joshua Gregory Rico ("Rico") was a resident of San Miguel County, New Mexico and worked as an Assistant Basketball Coach for PISD. On information and belief, before Rico was formally employed as an Assistant Basketball Coach, he was a volunteer basketball coach with access to PISD students.  Upon information and belief, the Fourth Judicial District Attorney's Office brought and is continuing to pursue criminal charges against Rico related to his sexual misconduct towards former students of PISD. Furthermore, on information and belief, Rico is under investigation by the FBI related to child pornography allegations involving students and former students of PISD, including Jane Doe

4.  Upon information and belief, at all times material hereto, Defendant Fred Trujillo ("Trujillo") was a resident of Sandoval County, New Mexico and Superintendent of Pecos ISD, until he accepted the position of Superintendent of Espanola Public Schools in the spring of 2019. As Superintendent of the PISD, Trujillo was a person charged with oversight of the operations of the school district, supervision of personnel and had final decision-making authority for the PISD.

5.  Upon information and belief, at all times material hereto, Defendant Michael Lister ("Lister") was a resident of New Mexico and held the position of Principal of Pecos Middle School and Athletic

Coordinator at PISD.  In those capacities, Lister was charged with oversight of the operations of Pecos Middle School and its sports teams, including supervision of personnel.

6.   With respect to the matters alleged in this Complaint, at all times material hereto, Rico, Trujillo and Lister were acting within the course and scope of their duties as employees of PISD, were state actors, acted under color of state law and had final decision-making authority.  The Board of Education also had final decision-making authority.

7.   This Court has jurisdiction over the parties hereto and the subject matter because Plaintiff's claims on behalf of Jane Doe are based on federal statutes and the United States Constitution, as more particularly described below.  The Court also has ancillary jurisdiction over state law claims brought by Ms. Garrity on Jane Doe's behalf.

8.   Venue is proper in this Court.

<u>General Allegations</u>

I.   <u>PISD's History of Indifference Towards Sexual Abuse of Students</u>

9.   Going back to at least the 2013-2014 school year, and Trujillo's tenure as Superintendent, PISD had a pattern and practice of failing to properly investigate complaints of sexual abuse of students, failing to take appropriate disciplinary action against sexual predators, targeting or retaliating against individuals who reported sexual abuse allegations and failing to train PISD employees to recognize, prevent and intervene in matters of student sexual abuse.  Upon information and belief, this pattern and practice continued even after two lawsuits were settled on behalf of two former students against PISD, Trujillo, former Assistant Basketball coach, Dominick Baca and former High School Principal Simon Miera for a total sum of approximately $1,500,000, and after a school janitor and two assistant basketball coaches were arrested on charges related to sexual abuse of students before Rico's arrest.

II.  <u>Teacher E.F.'s Sexual Abuse of Male Students</u>

10.  Upon information and belief, in October 2014, Pecos High School teacher E.F. was suspended by then Pecos High School Principal Manuel Lucero, for inappropriate behavior and failure to exercise the professional judgment after leaving student athletes unsupervised, sleeping in the lobby of a hotel during a cross country team trip with a young man identified as a former male student, and waking up girl students at 2:30 a.m. to let her into their hotel room.  Following the incident, E.F. was retained as a teacher but relieved of her duties as an assistant cross-country coach.

11. In February 2015, Pecos High School teacher T.H. ("T.H."), who had been working at PISD for almost eight years, was on parking lot duty at the high school when he observed E.F. passionately embracing and kissing high school student J.R. near E.F.'s mobile home, which was visible from the parking lot.  Although T.H. attempted to document the encounter with a photograph, he was unable to do so with his flip phone, which failed to focus.  After noting the embrace, T.H. saw J.R. drive off in his truck.

12. After contemplating what should be done about the incident, T.H. discussed the matter with fellow teacher, M.B. and later with Trujillo to report his personal observations. After T.H. reported the matter to Trujillo, Trujillo became visibly agitated and told T.H. that his word was not good enough and to stay away from gossip.

13. Although there had been rumors circulating about E.F.'s inappropriate relationships with male, underaged students for some time and T.H. now had proof of E.F.'s sexualized conduct with a student, Trujillo made clear to T.H.  that he had no intention of doing anything about the matter, despite the fact that E.F. had already been disciplined related to misconduct with a former male student.

14. At the outset of the 2015-2016 school year, newly appointed Pecos High School Principal C.L. ("C.L.") also heard rumors from parents about E.F.'s inappropriate conduct towards male students. After receiving complaints of E.F.'s inappropriate behaviors, C.L. herself observed inappropriate conduct by E.F. towards male students, including E.F.'s openly flirting with and touching male students, and E.F.'s wearing unprofessional and extremely provocative attire, which included tight, low-cut blouses showing cleavage, and tight pants which, when she bent over, showed hot pink thong underwear. When C.L., who was E.F.'s supervisor, attempted to counsel E.F. about her dress and conduct towards students, E.F. was extremely resistant to coaching and complained to Trujillo.

15. In 2016, E.F. told C.L. that a male student named O.R. had sent her inappropriate messages via Facebook. E.F. provided the messages to C.L. and also requested that O.R. be removed from her classroom, because she felt uncomfortable with him in her class. When O.R. came to C.L.'s office to discuss the matter, he was crying, saying that he was upset because E.F. had refused to "f--- him."

16. C.L. subsequently met with O.R. and his mother, and obtained copies of text messages between O.R. and E.F. in which she appeared to be flirting with O.R. At that time, O.R. reported that E.F. had been snapchatting inappropriate and nude photos of herself to him and that she had sex with another student. Incidentally, O.R. was the brother of J.R., the student that T.H. had observed kissing E.F.

17. After C.L. reported this matter to Trujillo, Trujillo became extremely agitated and told C.L. that she had no proof. Although C.L. then placed E.F. on a professional growth plan, E.F. showed no interest in following it and made clear that she did not respect C.L.'s authority. At that

time, Trujillo assigned teacher Simon Miera ("Miera") to work as an advocate for E.F.  Trujillo later promoted Miera to C.L.'s position as Principal of Pecos High School.

18. In addition to the statements made by student, O.R., C.L. also received a phone call from a concerned community member, who saw E.F. riding in a truck with another student, O.V., paying for his gas and being physically inappropriate with him. Although C.L. also told Trujillo about this allegation by email in February 2016, stating that E.F.'s conduct was inappropriate in terms of the morality and dignity of the educational professional, Trujillo still did nothing, and continued to protect E.F.

19. In March 2016, C.L. sent an email telling Trujillo she had received complaints by two students, G.V. and M.S., and the parents of female students, that E.F. favored the males in her classroom. During the same time frame, Head Basketball Coach Ira Harge ("Coach Harge") was told by students that E.F. was inappropriate with boy students and that she favored boys over girls in the classroom.

20. Thereafter, C.L. notified E.F. she would be meeting with E.F. to investigate "allegations of unfairness and gender bias."  On March 18, 2016, C.L. sent a letter to E.F. expressing her intention to discipline E.F. for her inappropriate conduct and advised Trujillo that a hearing would be conducted on Tuesday, March 22, 2016 to address E.F.'s conduct. It was C.L.'s intention to place E.F. on administrative leave and to perform a full investigation, as she felt obligated to do by law.

21. In response to C.L.'s announced intention to investigation E.F., Trujillo demanded that C.L. rescind her letter to E.F.  Trujillo then placed C.L., not E.F., on administrative leave for the remainder of the school year and did not renew C.L.'s contract, instead promoting Miera to the position of Pecos High School Principal.

22. Although Trujillo supposedly assigned another staff member, Debra Holt-Sena to take over an investigation into the allegations against E.F., upon information and belief, no thorough investigation was ever conducted, as neither T.H. nor C.L. were ever interviewed about their knowledge and observations of E.F.'s conduct or the written text messages that C.L. obtained from O.R.  Upon information and belief, E.F. never suffered any consequence as a result of the serious allegations made against her.  As of July 30, 2018, E.F. was elevated to the position of Instructional Coach.  Upon information and belief, E.F., to this day, still works as a teacher at Pecos High School.

23. After Trujillo began the course of retaliatory action against C.L. that would result in her ouster as Pecos High School Principal, T.H. met with Pecos School Board member Paul C de Baca ("C de Baca") and told C de Baca that he had personally observed E.F. kissing and embracing student, J.R.  Although C de Baca listened intently to the accusations, on information and belief, C de Baca took no further steps to address the situation and to ensure the safety and rights of the students.

24. After reporting the matter to C de Baca, T.H. also saw a second Pecos School Board member, Victor Ortiz ("Ortiz") at a gas station.  Although T.H. had not reported the matter to Ortiz, when Ortiz saw T.H., he began yelling at T.H. from a distance, calling him "disloyal" to the school.

25. T.H. resigned his employment with PISD after being targeted for bringing forth allegations against E.F.  Both C.L. and T.H. were traumatized by their experience at PISD and continue to fear retaliation as a result of their whistleblowing.

### III.   The Misconduct of Pedophile Janitor Louie Vigil

26. As early as 2013 or 2014, teacher T.H. witnessed PISD janitor, Louie Vigil ("Vigil") taking young male students into his janitorial closet.  He also saw Vigil watching a movie with a student alone in a classroom after school.  When T.H. spoke to Trujillo's wife, Aniesa Trujillo ("Aniesa"), who was employed as the School Counselor, about Vigil Aniesa told T.H. that Vigil should never be left alone with students.

27. During her tenure as High School Principal, C.L. also became concerned about Vigil after learning that  Vigil had been asking students for their phone numbers.  Coach Harge was also aware that Vigil was not only asking for student phone numbers, but also was attempting to "friend" them on Facebook.  When C.L. brought her concerns about Vigil to the attention of Trujillo and sought to reprimand Vigil, Trujillo poo-poed C.L.'s concerns, telling her that Vigil was "special" and "harmless."

28. Upon information and belief, in the fall of 2017, Vigil was arrested on numerous felony charges related to criminal sexual penetration of a minor who was a student at PISD and his relative.  Although Vigil was fired from PISD after his arrest, in the months and years leading up to Vigil's arrest, Trujillo and PISD failed to recognize and address concerns that were made known to them by C.L., T.H., Coach Harge and Trujillo's own wife, Aniesa.

### IV.   The Sexual Misconduct of Assistant Basketball Coach Dominick Baca

#### A.   Baca's Attempted Seduction of Student E.C.

29. Dominick Baca ("Baca") was an Assistant Basketball Coach and Gear-Up Coordinator for PISD.  In the spring of 2016, Baca attempted to establish an inappropriate relationship with Pecos High School student, E.C., who was 16 years old at the time.  When, two years later, New Mexico State Police investigated allegations against Baca, they also learned that E.C.'s sister, a

Pecos middle school student, had also reported that Baca had inappropriately touched her during a basketball practice.

30. E.C. reported Baca's solicitation of a relationship with her to Coach Harge in May, 2016, who, in turn, reported the matter to Trujillo, Lister and Miera.

31. Instead of conducting an appropriate investigation into Baca's conduct towards E.C., Trujillo accepted Baca's implausible explanation that he was not the "Dominic" who had been texting E.C. messages, and failed to discipline Baca for his actions towards E.C.

32. If Trujillo had conducted even a cursory investigation, he would have learned that Baca's reputation for soliciting inappropriate relationships with students was so well known that one member of the basketball team posted a meme of Baca with a smiling face saying, words to the effect:  "Coach Baca when he sees the new crop of freshman girls."  Baca was also known for having girl students alone in his classroom, giving them gifts and horsing around with them.  He was also seen at public events holding hands with female students.

33. After learning of E.C.'s specific allegations, Trujillo, Lister, Miera and the Board of Education did not report suspected child abuse of E.C. by Baca to the New Mexico Children, Youth and Families Department ("CYFD") or to law enforcement and took no remedial action against Baca.

34. When E.C. came forward with allegations regarding Baca's conduct, she was chastised, ridiculed and harassed by other students to the point where she transferred schools, and PISD failed to take appropriate remedial action to stop such behavior.  As a result of Defendants' failure to take appropriate action against Baca, Defendants emboldened and empowered Baca.

### B.   Baca's Sexual Relationship with Student F.D.

35.     In the fall of 2016, Baca began grooming another student, this time 14-year-old freshman, F.D., for a sexual relationship.   During the course of their interactions, which began after F.D. expressed an interest in Gear-Up, Baca made repeated statements to F.D. of a personal and sexual nature with the intent of creating a personal and inappropriate relationship with her and attempted to convince F.D. to have sexual relations with him in the girls' locker room at the high school.

36.     Via his cell phone, Baca sent nude photos of himself to F.D., including photos of himself with an erect penis and solicited F.D. to send inappropriate photographs of herself. Baca also made repeated remarks to F.D. of a personal nature, including telling her she was gorgeous or pretty.

37.     In February 2017, during the evening of the basketball Homecoming event, Baca was texting with F.D., asking if she wanted to meet up with him.  After F.D. returned home from the Homecoming party with a high school friend who was spending the night at F.D.'s house, Baca texted F.D. telling her he was outside her residence in her car. When F.D. left her residence, she found Baca sitting in his parked vehicle down the street from her residence.  F.D. entered Baca's vehicle, where Baca solicited and convinced F.D. to perform oral sex on him.  As a minor, F.D. could not consent to sexual relationship with Baca.

38.     Approximately two weeks after Homecoming, in the spring of 2017, Baca asked F.D. come to his home and F.D. agreed. Baca then picked F.D. up in his car and brought her to his house, where he took F.D. to his bedroom, began kissing her and had sexual intercourse with her.

39.     Baca told F.D. not to tell anyone about their relationship because Baca would get into trouble if she did.  He also made sure that all photographs which had been exchanged were

sent via Snapchat so that no record would remain of them and instructed F.D. to delete all texts messages that they exchanged.  F.D. did as Baca instructed.

40.     After F.D.'s friends told the school counselor about the inappropriate relationship between F.D. and Baca, the New Mexico State Police ("NMSP") initiated a criminal investigation into the conduct of Baca.  Baca again instructed F.D. to make sure that she deleted evidence of all exchanges between them, so that he would not get in trouble with the law.  Although NMSP declined to pursue the matter because F.D. denied the relationship with Baca, Defendants took no action to investigate the matter in-house.

41.     Had Defendants properly investigated the matter, they would have learned that several teachers, school employees and students had concerns about Baca's inappropriate behavior with female students.  In fact, one school employee, L.S., told Trujillo that student K.O. came into the office and told her that Baca and another student, A.O., had been acting like a couple at a GEAR-UP event at UNM.  In response, Trujillo told L.S. to watch what she says, that the information was not true and to his knowledge, Baca was dating a student who had just graduated. Subsequently, L.S. told Lister that she would not allow her son, who was a student, to go on a field trip with Baca, because she believed Baca was a pedophile.  In response, Lister told the teacher that she had better stop saying things about Baca because she could be sued for defamation.

42.     Although F.D. originally denied any inappropriate relationship with Baca, F.D. subsequently came forward in the Spring of 2018 and told a school counselor about her relationship with Baca.

43.     When F.D. ultimately came forward with allegations regarding Baca's conduct, she, like E.C., was also chastised, ridiculed and harassed by other students, pressed for details by faculty and staff and ultimately withdrew to her home to take on-line classes, ultimately being

forced to transfer out of PISD because of the hostile environment she endured at Pecos High School.

C.   Baca's Sexual Relationship with Student J.D.

44. In the spring of 2018, Baca also began an inappropriate sexual relationship with another high school student, junior, J.D., who had sexual interactions, including intercourse, with Baca.

45. Originally, when Trujillo learned about J.D.'s allegations, he placed Baca on brief administrative leave, with plans to allow him to return to school and to attend a school field trip. When Baca was later arrested and taken to jail by authorities, rather than firing him outright, upon information and belief, Trujillo went personally to the jail and allowed Baca to write a letter of resignation.  Trujillo then accepted Baca's resignation by a letter in which he also thanked him profusely for his service to PISD.  Even at that juncture, after three students came forward with allegations against Baca, PISD did not perform any investigation into Baca's conduct.

46. J.D., like F.D. and E.C., found herself being maligned, ridiculed and ostracized as a result of her allegations against Baca, about which PISD did nothing.

D.   The Sexual Misconduct of Assistant Basketball Coach Apolonio Blea

47. Apolonio Blea ("Blea") was an Assistant Basketball Coach at Pecos Middle School and an Assistant Basketball Manager at Mora High School.  In May 2018, Blea was charged with raping and stabbing a 14-year-old student at Mora, with whom he was allegedly exchanging nude pictures and explicit text messages going back to February 2016.

48. Upon information and belief, Defendants did nothing to train or instruct Blea or other part-time coaches about inappropriate contact with students.  Blea was later fired from PISD.

12

E.   The Civil Lawsuits Arising from Baca's Conduct and Criminal Conviction of Baca

49. On or about May 14, 2018, a civil lawsuit against Baca, Trujillo, Miera and the PISD Board related to Baca's sexual abuse of J.D. was filed in the Fourth Judicial District, State of New Mexico, County of San Miguel, captioned D-412-CV-2018-00283, which was subsequently removed to this Court, captioned 1:18-CV-00527 KBM/KK.

50. On or about December 14, 2018, a civil lawsuit against Baca, Trujillo, Miera and the PISD Board related to Baca's sexual abuse of F.D. was filed with this Court, captioned 1:18-CV-1181 KK/JHR.

51. During the course of F.D.'s lawsuit, Coach Harge testified that he learned that Baca was having sexual relationships with the mothers of several members of the Pecos High School Basketball team and that Baca also told him that he had had sex with teacher E.F. "over 50 times." Coach Harge's response to this clearly inappropriate conduct was simply to tell Baca to "be careful," expressing concern for him, rather than the students. Coach Harge and other witnesses also made clear that they had received no real training in how to identify and report potential sexual predators or how to report suspected child sexual abuse.

52. On or about December 18, 2018, J.D.'s lawsuit was settled for the sum of $290,000.

53. On or about August 13, 2019, F.D.'s lawsuit settled for the sum of $1,212,500.

54. During the summer of 2019, Baca pled guilty to raping F.D. and J.D.  He is now in prison.

55. Upon information and belief, despite the proliferation of sexual abuse allegations, criminal charges, civil lawsuits and substantial settlements during the period 2013-2018, PISD and these Defendants still took no real action to educate and train staff, students and teachers about the dangers of sexual abuse and to prevent further abuse of its students and failed to properly

investigate allegations made against sexual perpetrators, thus abdicating their responsibilities under state and federal law.

56. Furthermore, the Board of Education knew or should have known about the deficiencies in Trujillo's handling of the sexual abuse claims against E.F., Louie Vigil, Dominick Baca, and Apolonio Blea, and yet did nothing to address those deficiencies and to fulfill its obligation to protect students by properly supervising Trujillo.

V.   Rico's Affiliation with PISD and Abuse of Jane Doe

A.   Rico's Volunteer and Paid Employment with PISD

57. Upon information and belief, Rico graduated from Pecos High School in 2014, where he served on the boys' basketball team.

58. On December 10, 2018, Trujillo, in his capacity as Superintendent of PISD, presented a "Non-Employee Agreement" to Rico, hiring Rico for the position of "Assistant Boys Basketball Coach" with a salary of $1,261.00 starting on August 7, 2018, and reportedly ending on May 23, 2019.  Upon information and belief, before Rico was officially hired by PISD, he also acted as a "volunteer" coach and attended sports events with PISD, including riding on school buses to events.

59. On July 9, 2019, Rico's contract was renewed by Trujillo, with increased pay of $2,272.00, to begin August 6, 2019 with a duration of employment expected through May 21, 2020.

60. Rico worked as a coach with both the boys' middle school and high school basketball teams and was supervised by or took direction from Defendants and other PISD school officials including Coach Harge.

61. As an Assistant Basketball Coach, Rico ran practices and conducted workouts in the Pecos High School gymnasium where afternoon practices were shared with the Pecos Middle School girls' basketball team.

62. During the time of his paid and volunteer association with PISD, Rico spent many hours in the Pecos High School and Pecos Middle School gyms with PISD middle and high school students and attended athletic events, which gave him access to middle and high school girls enrolled with PISD.

63. With respect to the matters alleged below, Rico was acting within the course and scope of his duties as a paid or volunteer employee of PISD, was a state actor, and acted under color of state law.  Without being permitted by PISD to engage in activities with students on a volunteer basis, Rico would not have been in a position to harm Jane Doe in the manner set forth below.

B.  Defendant Rico's Extortion and Sexual Exploitation of Jane Doe

64.  Jane Doe attended Pecos Middle School as an 8th grader during the 2018-2019 school year.  Jane Doe attended Pecos High School as a 9th grader during the 2019-2020 school year.

65.  A talented athlete, Jane Doe was a member of the Lady Panthers varsity basketball team, which practiced in the Pecos High School and Pecos Middle School gyms.

66. Jane Doe first recalls having had visual contact with Rico in the summer of 2018, while practicing in the Pecos High School gym during "open gym" when her teammates pointed out the new Assistant Basketball Coach for the High School boys' basketball team.

67. Shortly thereafter, Rico sent a Snapchat invitation to Jane Doe.  Jane Doe denied Rico's Snapchat request and told Assistant Basketball Coach Lawrence Ragland that Rico sent her a Snapchat invitation.  Upon information and belief, Ragland failed to report the incident to school authorities or law enforcement, despite the fact that by then, New Mexico State Police had already

begun investigating allegations of sexual abuse by Baca by interviewing teachers, administrators and students of PISD.

68. Sometime in the fall of 2018, while exiting the Pecos High School locker room, following the conclusion of a game, Jane Doe's mother noticed Rico watching her daughter.  She also observed Rico watching her daughter at one of her games and on another occasion as Jane Doe was going from the Middle School gym to the High School gym.

69. Sometime in the fall of 2018, while sitting on the bench with Jane Doe's varsity basketball teammates, a female high school student, L.G. reported that Rico had sent her a picture of his penis. She commented that it was "gross."

70. Sometime in the spring of 2019, during the time that Jane Doe was an 8th grade student at Pecos Middle School and member of the varsity softball team, she received a Snapchat invitation request from an individual who identified himself as "Chris Lujan," holding the Snapchat account 'clujan0420.' "Chris Lujan" represented to Jane Doe that he was a student at V. Sue Cleveland High School in Rio Rancho, said "Hey" to Jane Doe. Jane Doe accepted his Snapchat request.

71.  Unbeknownst to Jane Doe at the time, the individual named "Chris Lujan" did not exist and Rico had adopted the fictitious name and identity as part of his scheme to ensnare Jane Doe into a sexual relationship by threatening and blackmailing her and other girls.

72. For the first several weeks following "Chris Lujan's" Snapchat invitation, "Chris Lujan" and Jane Doe began regularly texting on Snapchat.  "Chris Lujan" would contact Jane Doe when she finished her athletic practice, and they would "talk" via text messages about school and sports. "Chris Lujan" used kind and sympathetic language with Jane Doe calling her "beautiful" and "pretty" and would routinely ask about her day at school and the progress of her athletic practices.

73. Sometime in the spring of 2019, Jane Doe asked "Chris Lujan" how old he was, and he replied, "you tell me first, how old are you?" Jane Doe replied, "I'm 14." "Chris Lujan" then told Jane Doe he was 15 years old.

74.  After several weeks of communication via Snapchat, "Chris Lujan" asked Jane Doe for a nude picture of herself. Jane Doe complied and sent him a nude picture of herself.   In response, "Chris Lujan" sent Jane Doe a picture of his penis and a picture of his face, which was partially obscured.

75. At the time, Jane Doe thought "Chris Lujan" bore a similarity to Rico, the new Assistant Basketball Coach she had seen in the Pecos High School gym in the summer of 2018, but she did not mention this to "Chris Lujan."

76. In the spring of 2019, Jane Doe was with a friend after softball practice, when she received a Snapchat invitation from an individual who identified himself as "Erik Romero." Jane Doe accepted his invitation.  Unbeknownst to Jane Doe at the time, the individual named "Erik Romero" did not exist and Rico had adopted the fictitious name and identity as part of his scheme to ensnare Jane Doe into a sexual relationship by threatening and blackmailing her and other girls.

77. Unlike "Chris Lujan," "Erik Romero" was aggressive and demanding from the very first Snapchat message, telling Jane Doe:   "[I]f you don't do what I tell you to do, I will send your naked pictures to everyone."

78. Jane Doe was surprised by "Erik Romero's" demand and did not believe he had a nude picture of her. She asked him to "prove it." Thereafter, "Erik Romero" sent Jane Doe a nude picture of herself, the same picture she had provided to "Chris Lujan."

79. "Erik Romero" also told Jane Doe that if she did not comply with his directives, he would expose nude photographs of Jane Doe to the entire community.  To prove that he would

make good on his threat, "Erik Romero" also sent Jane Doe nude photographs of other girls, including girls from Pecos who Jane Doe knew.

80. Soon thereafter, Jane Doe contacted "Chris Lujan" via Snapchat and told him that an individual named Erik Romero had contacted her and wanted her to do "stuff" with her.  Jane Doe asked "Chris Lujan" how "Erik Romero" could have the same photograph that she had sent to "Chris Lujan" privately. "Chris Lujan" then denied knowing anything about the photograph.

81. "Erik Romero" continued to contact and threaten Jane Doe, exclusively using the platform of Snapchat, which automatically deleted communications so there was no record of it. The relationship between Jane Doe and the fictitious "Erik Romero" was contentious and fractious.

82. Because Jane Doe informed "Erik Romero" that her parents required her to turn in her cell phone to a family charging station by 9:30 p.m. every night, "Erik Romero" began a pattern and practice of contacting Jane Doe consistently via Snapchat texts after she had arrived home from her athletic practice and communicating with her until just before 9:30 p.m.

83.  During these daily Snapchat exchanges, "Erik Romero" never showed his face, but would begin the conversation with a demand for Jane Doe to send him a nude picture or a sexual video, using words to the effect:  "it's time,"  "you have to do it," "don't make me mad," "you brought this on yourself," "don't tempt me," and "I don't care you have to do it."

84.  During these interchanges, "Erik Romero" would send graphic images of himself, including images of himself naked, with a fully erect penis.  "Erik Romero" also coerced Jane Doe into watching him masturbate on Snapchat video and pushed Jane Doe to do the same, by continually threatening Jane Doe with exposure if she did not do as he said.

85. Jane Doe was in fear daily that if she did not meet the demands of "Erik Romero," he would expose her to her family and community.

86. During the time that Jane Doe was being extorted by "Erik Romero," her parents noticed a dramatic change in her personality.   Once an outgoing and happy girl, after she began a surreptitious relationship with "Erik Romero," Jane Doe became unhappy, uncooperative, secretive and spent much of her time alone in her room.

87.  In the spring of 2019, Jane Doe asked a few of her friends if they had ever heard of or seen "Erik Romero" on other social media platforms. One friend claimed that she had seen an individual named "Erik" on Snapchat and that he was 18 years old. When that friend attempted to contact "Erik" and warn him that he was flirting with a minor, Jane Doe, "Erik" blocked her access to his account.

88. Sometime in or around December 2019, Jane Doe's parents took away her cell phone for two weeks. After Jane Doe's phone was returned to her, "Erik Romero" resumed communications with her, but was extremely angry about Jane Doe's absence and escalated his threatening and demanding behavior, frightening Jane Doe in the process.

89.   From spring 2019 through January 2020, "Erik Romero" also directed Jane Doe to perform and record certain sexual acts on Snapchat video, under threat that he would expose her if she did not comply.  Upon information and belief, Jane Doe estimates that she sent over 100 photographs and videos of a sexual nature to "Erik Romero."

90. In early January 2020, Jane Doe told "Erik Romero," that she was suicidal.  For the first and only time, he replied, "OK you don't have to send me a picture tonight."

91. In mid to late January 2020, "Erik Romero," texted Jane Doe, telling her that she needed to send a friend request to Rico on Snapchat and demanded that Jane Doe perform fellatio on Rico, and that if she did not do as he commanded, he would expose her nude photographs on social media.

92. Jane Doe confided in her friends, fellow students A.G. and R.F. that she was suicidal.

93. Jane Doe complied with "Erik Romero's" demand and sent a friend request to Rico on Snapchat. Rico accepted Jane Doe's friend request and subsequently sent her a picture of his penis and testicles. Because the background in the naked picture Rico sent had the same background as the naked pictures "Eric Romero" sent, Jane Doe then realized that Rico and "Erik Romero" were the same person.

94. Several days later, an increasingly desperate, terrified, and hysterical Jane Doe confided in her friends, fellow students M.O., E.O, and S.N., the demands "Erik Romero" recently made and her realization that it was in fact Rico who had been sexually exploiting and blackmailing her for over a year in the name of "Erik Romero."

95. Upon information and belief, M.O. and S.N. told PISD school counselor Kristen Encinias who told the authorities.

96. Following M.O., E.O. and S.N.'s report to school authorities, Lister failed to recognize the gravity of the situation and announced during a staff meeting "those girls are not as innocent as you think," failing to recognize that minor students cannot consent to sexual conduct with school employees under state and federal laws, and blaming Rico's victims, taking no responsibility for the fact that the entire athletic department had had multiple warnings that two of its coaches had been behaving in an sexually inappropriate manner with minor students and took no action to correct any such behaviors.

97. Upon information and belief, PISD failed to conduct any investigation into the allegations made by Jane Doe against Rico.

VI.    <u>Defendant Rico's Abuse of Other PISD Students</u>

A.  <u>Defendant Rico's Extortion and Sexual Exploitation of K.M.</u>

98. Upon information and belief, beginning in 2016, Rico initiated a relationship that was sexual in nature with K.M. who was a freshman at Pecos High School.  K.M. and Rico exchanged photos and videos of a sexual nature.  Rico told K.M. he was in his room while sending the videos and pictures to her.  Rico and K.M.'s relationship ended in 2016.

99. Beginning in April 2018, "Chris Lujan" began blackmailing K.M. using the Snapchat account "clujan0420."  "Chris Lujan" had nude pictures of K.M. and told her that if she did not send him nude pictures and videos of a sexual nature, he would expose her online.  Rico's demands were daily.  Twice when K.M. did not respond to his Snapchat messages, "Chris Lujan" posted naked pictures of K.M. to his Snapchat story and tagged her username, showing K.M. that he was serious and would follow through with his threats.  Upon information and belief, K.M. continued to send nude photos and videos for approximately six months to a year.

100.    Next, "Chris Lujan" demanded that K.M. perform oral sex on someone and send him proof.  Because of her previous relationship with Rico, K.M. performed oral sex on Rico. Rico recorded K.M. performing oral sex on him and emailed the video to K.M., who forwarded the video to "Chris Lujan" to meet his demands.

101.    On several occasions, Rico attempted to digitally penetrate K.M., but K.M. said no. Shortly thereafter, "Chris Lujan" demand that K.M. allow the person she performed oral sex on to digitally penetrate her.

102.    From 2016 into 2018, K.M. sent approximately 20 videos and pictures of a sexual nature to Rico and Rico sent approximately 30 pictures of his penis and approximately 20 videos of him masturbating to K.M.

103.     In addition to demanding that K.M. send him videos of her performing oral sex on someone, "Chris Lujan" demanded that K.M. send her naked pictures of fellow Pecos High School student J.V.

104.     Upon information and belief, K.M. believed Rico and "Chris Lujan" to be the same person because the background of the videos and photos were the same and Rico's penis looked the same as "Chris Lujan's" penis.   In addition, the Snapchat account for "Chris Lujan," "clujan0420," attached to K.M.'s known phone number for Rico.

B.   Defendant Rico's Sexual Exploitation of M.G.

105.     Upon information and belief, Rico initiated a relationship that was sexual in nature with M.G. during her junior year at Pecos High School when she was 16 years old.   Rico sent M.G. pictures of his penis and she would send Rico nude pictures of herself because he requested them. Rico digitally penetrated M.G.'s vagina when she was either a junior or senior at Pecos High School and he was a coach for Pecos High School.

VII.     The Defendants' Deliberate Indifference Towards Sexual Abuse

106.     At all times material hereto, PISD failed to have in place appropriate policies, procedures, or training for staff and students consistent with Title IX and other legal requirements, including sexual harassment and abuse identification, reporting, investigation, corrective action and prevention of retaliation. PISD failed to educate administrators, staff, coaches and students about their rights and responsibilities.

107.     Upon information and belief, PISD did not have in place, at any times material hereto, a policy or procedure directing students regarding reporting sexual harassment by school staff or administrators and did not provide training to students regarding identifying sexual harassment.   Nor did it have any policies defining appropriate boundaries regarding

22

communications between staff and students via email, texting, social media, or cellular devices, such as phones.

108.     Upon information and belief, PISD did not have a Title IX Coordinator in place to field complaints of discrimination and to ensure appropriate investigations into allegations of sexual discrimination against students.

109.     Upon information and belief, PISD did not include coaches or assistant coaches in staff meetings in which any discussions of matters related to the District's obligation to address and prevent sexual abuse of students.

110.     Even after the history of Dominick Baca's sexual grooming and abuse of three students was brought to the fore in connection with lawsuits filed by F.D. and J.D., and after the payment of approximately $1,500,000 in settlements, and after the arrests of Antonio Blea and Louie Vigil, upon information and belief, PISD took no remedial step to address the deficiencies set forth in paragraphs 104-107, above, which could have prevented and identified Rico's sexual exploitation and abuse of Jane Doe and others.

<u>Count I.</u>
(For Substantive Due Process Violations Pursuant to 42 U.S.C. §1983 Against Rico)

111.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-110, above, as though set forth in detail.

112.     Plaintiff brings this claim pursuant to 42 U.S.C. §1983 seeking redress for violation of Jane Doe's constitutional right to substantive due process protected by the Fourteenth Amendment to the United States Constitution.  Jane Doe has a right and fundamental interest in her bodily integrity, personal safety, privacy and freedom from unlawful invasion and violation of her person, and the right to not be subjected to an unsafe environment in which she was vulnerable to physical and emotional injury and abuse.

113.     Rico acted under color of state law to deprive Jane Doe of her constitutional rights when he perpetuated his ongoing sexual abuse and exploitation, extortion, and criminal sexual communication against Jane Doe, as described above.

114.     Rico acted knowingly, recklessly or with deliberate indifference to and in callous disregard of the rights of Jane Doe and his behavior shocks the conscience.

115.     As a direct and proximate result of the conduct of Rico, Jane Doe has suffered and will continue to suffer damages in an amount to be proved at trial, which include but are not limited to emotional and psychological distress and trauma, which have interfered with Jane Doe's educational opportunities and have or will adversely affected her for the rest of her life.

116.     Plaintiff is also entitled to recover punitive damages on behalf of Jane Doe based on Rico's reckless indifference to Jane Doe's constitutionally protected rights.

117.     Plaintiff is also entitled to pre-judgment interest, reasonable attorney's fees and costs of pursuing this action on behalf of Jane Doe pursuant to 42 U.S.C. §1988.

<u>Count II.</u>
(For Equal Protection Violations Pursuant to 42 U.S.C. §1983 Against Rico)

118.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-117, above, as though set forth in detail.

119.     Plaintiff brings this claim pursuant to 42 U.S.C. §1983 seeking redress for violation of Jane Doe's constitutional right to equal protection protected by the Fourteenth Amendment, which protects the right of Jane Doe to be free from sexual abuse, harassment, assault, extortion and sexual communication by a school employee.

120. Rico acted under color of state law to deprive Jane Doe of her constitutional rights when he perpetuated sexual abuse and exploitation, extortion, and criminal sexual communication against Jane Doe as described above.

121.   Rico acted knowingly, recklessly or with deliberate indifference to and in callous disregard of the rights of Jane Doe and his behavior shocks the conscience.

122.   As a direct and proximate result of the conduct of Rico, Jane Doe has suffered and will continue to suffer damages in an amount to be proved at trial, which include but are not limited to emotional and psychological distress and trauma, which have interfered with Jane Doe's educational opportunities and have or will adversely affect her for the rest of her life.

123.   Plaintiff is also entitled to punitive damages on behalf of Jane Doe based on Rico's reckless indifference to Jane Doe's constitutionally protected rights.

124.   Plaintiff is also entitled to pre-judgment interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

Count III.

(For Substantive Due Process and Equal Protection Violations Pursuant to 42 U.S.C. §1983 Against Trujillo, Lister, and Board of Education)

125.   Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-124, above, as though set forth in detail.

126.   Defendants, Board of Education, Trujillo and Lister were aware of and had actual notice of a pattern of sexual misconduct and inappropriate contact between PISD employees and students, as evidenced by the history of misconduct by teacher E.F., Louie Vigil, Dominick Baca and Apolonio Blea and did nothing to correct or abort the pattern and practice of sexual abuse of students at PISD, thus enabling and encouraging Rico that any misconduct would go unchecked.

127.   In addition, upon information and belief, these Defendants knew or should have known about Rico's inappropriate contact with minor female students, which could have been uncovered if they had appropriately investigated and punished the inappropriate conduct by the teacher, janitor and two other Assistant Basketball coaches identified herein.

128. Further, these Defendants had a duty to ensure reasonably safe conditions for students of PISD and freedom from unjustified intrusions into their personal security and bodily integrity and failed to take appropriate remedial action to prevent and stop the sexual misconduct perpetuated by Rico against Jane Doe and other students at PISD.

129. Finally, these Defendants were deliberately indifferent to and tacitly approved of the sexual misconduct of Rico based on their numerous acts and omissions outlined above, which shock the conscience.

130. As a direct and proximate result of the conduct of these Defendants, Jane Doe has suffered and will continue to suffer damages in an amount to be proved at trial, which include but are not limited to emotional and psychological distress and trauma, which have interfered with Jane Doe's educational opportunities and have or will adversely affect her for the rest of her life.

131. Plaintiff is also entitled to punitive damages based on Trujillo and Lister's reckless indifference to Jane Doe's constitutionally protected rights and her health, safety and welfare.

132. Plaintiff is also entitled to pre-judgment interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

<u>Count IV.</u>
(For Title IX Violations Pursuant to 20 U.S.C. §1681(a) Against the Board of Education)

133. Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-132, above, as though set forth in detail.

134. PISD received federal funds and is bound by Title IX regulations which are subject to administrative enforcement by the U.S. Department of Education, as well as enforcement by private litigants through the courts.

135. By virtue of her gender, Jane Doe had a right pursuant to Title IX to be free from sexual misconduct.

136.     The Board of Education had appropriate knowledge of the sexual harassment and misconduct perpetuated by Rico or were deliberately indifferent to Rico's sexual harassment and misconduct.    Although the Board of Education had the authority and responsibility to end the harassment, misconduct and abuse, prevent its recurrence and remedy its effects, it failed to do so.

137.     The Board of Education's actions were sufficiently severe and pervasive to create a hostile and abusive environment which denied or limited Jane Doe's ability to participate in or benefit from educational programs or activities at PISD.

138.     As a direct and proximate result of the conduct of the Board of Education, Jane Doe has suffered and will continue to suffer damages in an amount to be proved at trial, which include but are not limited to emotional and psychological distress and trauma, which have interfered with Jane Doe's educational opportunities and have or will adversely affect her for the rest of her life.

139.     Plaintiff is entitled to an award of her reasonable attorney's fees and costs against the Board of Education.

### Count V.
(Negligent Operation of Schools Pursuant to NMSA 1978, §41-4-6 Against the Board of Education)

140.     Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-139, above, as though set forth in detail.

141.     Plaintiff has satisfied all conditions precedent to bringing an action pursuant to the New Mexico Tort Claims Act.  Although Jane Doe did not submit a Tort Claims Act notice within 90 days of the sexual misconduct of Rico, the Board of Education had actual knowledge of the events set forth herein as of January 2020 when school employees were notified of the sexual harassment and misconduct perpetuated by Rico and the NMSP began its investigation into conduct by Rico.

142.    The Board of Education knew or should have known about a pattern of sexual misconduct towards and abuse of students by teacher E.F., janitor Louie Vigil, Assistant Basketball coaches Baca, Blea and Rico, which occurred on PISD grounds, including Rico's grooming and sexual exploitation of students through electronic media and cellular devices.

143.    The Board of Education was negligent in its failure to address and prevent Rico from engaging in the acts of sexual abuse, exploitation, extortion and misconduct set forth above, which created an unsafe and dangerous condition on school premises and a foreseeable and pervasive risk of harm to students, including Jane Doe.

144.    The Board of Education's actions and inactions described herein constitute negligence in the operation and maintenance of PISD, which created conditions which posed a danger to students and for which immunity has been waived under NMSA 1978, §41-4-6.

145.    As a direct and proximate result of the actions and inactions of the Board of Education, Jane Doe has suffered and will continue to suffer damages in an amount to be proved at trial, which include but are not limited to emotional and psychological distress and trauma, which have interfered with Jane Doe's educational opportunities and have or will adversely affect her for the rest of her life.

<u>Prayer for Relief</u>

Based on the foregoing, Plaintiff prays for judgment on behalf of Jane Doe against Defendants, jointly and severally, in an amount to be determined at trial, including compensatory and punitive damages (as available), for prejudgment and post-judgment interest, attorney's fees and costs as permitted by statute, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE HEMPHILL FIRM, P.C.

By: Linda G. Hemphill, Esq.
Linda G. Hemphill
Leigh Messerer
P.O. Box 33136
Santa Fe, New Mexico 87594
(505) 986-8515

Attorneys for Plaintiff, Diane Garrity, in her capacity as Court-Appointed Guardian Ad Litem for Jane Doe

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Diane Garrity, as Court-Appointed Guardian Ad Litem for Jane Doe, a minor

**(b)** County of Residence of First Listed Plaintiff   San Miguel
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

The Hemphill Firm, P.C., P.O. Box 33136, Santa Fe, NM 87594, Linda G. Hemphill, Leigh Messerer and Emma

## DEFENDANTS

Board of Education of the Pecos Indenpendent School District, Joshua Gregory Rico, Fred Trujillo and Michael

County of Residence of First Listed Defendant   San Miguel
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

### CIVIL RIGHTS
- ☒ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983

Brief description of cause:
Sex abuse by school personnel

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   05/04/2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ___   AMOUNT ___   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___